# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

v.     :     MAGISTRATE NO. 20-1002

LORE-ELISABETH BLUMENTHAL     :

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER

The defendant, Lore-Elisabeth Blumenthal, intentionally set fire to two Philadelphia Police Department vehicles on May 30, 2020. On that day, the defendant traveled to lawful protests being held in Center City Philadelphia armed not with a protest sign, but rather with heat-resistant gloves and goggles. Video and photographic footage show her using those tools as she placed flaming cardboard into a police sedan. After the fire began to engulf the sedan, the defendant removed a burning piece of wood (part of police barricades set up in the area of City Hall) from the sedan and forced it through a window of a police SUV parked to the side of the sedan, setting that second vehicle on fire as well. When the defendant decided to set fire to these vehicles, she risked the safety and lives of numerous individuals who were in the vicinity of these vehicles. She destroyed two police vehicles – vehicles that are used by the Police Department to respond to emergencies and protect the citizens of Philadelphia. The evidence against the defendant and the significant sentence she faces if convicted demonstrate both her extreme danger to the community and risk of flight.

On June 19, 2020, the Honorable Judge Marilyn Heffley, U.S. Magistrate Judge, accordingly found that the defendant presented both a danger to the community and a risk of flight, and ordered her held pending trial. This order should be affirmed.

This Court's review of the order is de novo, though "[i]n most cases the district court will find it useful to consider carefully the decision and reasoning of the magistrate." *United States v. Delker*, 757 F.2d 1390, 1395 (3d Cir. 1985).

Here, the case for pretrial detention, as reflected by Judge Heffley's assessment, is overwhelming, based on the nature of the defendant's criminal conduct, the penalties she faces, and the risk of flight. In seeking a different result, the defense addresses virtually none of these facts, relying instead on numerous letters from family and community members who hold the defendant in high esteem but are either unaware of her alleged conduct or unable to reconcile that conduct with the person they know. For the reasons set forth here, the detention order should be maintained.

Detention is warranted upon a finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Danger to the community must be established by clear and convincing evidence, while risk of flight may be shown by a preponderance of the evidence. 18 U.S.C. § 3142(f)(2).[1]

---

[1] Importantly, there is a presumption of detention in this case. Section 3142(e)(3) provides: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to

### A. The Evidence is Explicit and Demonstrates Danger to the Community.

Here, the proof of danger is not just clear and convincing – it is on videotape. The defendant stipulated to probable cause, for good reason.

On Saturday, May 30, 2020, large-scale protests took place in Philadelphia and throughout the United States, addressing the recent death of George Floyd at the hands of Minneapolis police officers and other grievances. The Philadelphia protests were peaceful through much of the day, but unfortunately as the day wore on acts of violence and looting occurred. Blumenthal used the occasion to set fire in dramatic fashion to two marked Philadelphia police vehicles that were stationed in Center City as part of the police effort to maintain order.

---

believe that the person committed. . . (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed . . . ." Here, Blumenthal is charged in part with a violation of 18 U.S.C. § 844(f)(2), for using fire to destroy property of an organization receiving federal financial assistance, "and as a result of such conduct, directly or proximately caus[ing] personal injury or creat[ing] a substantial risk of injury to any person, including any public safety officer performing duties." The maximum penalty for this offense is 40 years' imprisonment.

Section 2332b(g)(5)(B) presents a list of offenses, including "844(f)(2) or (3) (relating to arson and bombing of Government property risking or causing death)." This parenthetical appears to present a scrivener's error, in that Section 844(f)(3) requires causation of death, while Section 844(f)(2) does not – as noted above, Section 844(f)(2) requires "a substantial risk of injury." Thus, the specific inclusion in this list of Section 844(f)(2), by incorporation in Section 3143(e)(3)(C), creates a presumption of detention for a violation of this statute. In any event, detention is plainly established here regardless of the presumption.

The defendant's acts were captured in photographs, in video, and in news footage broadcast live on television. She went to the north side of City Hall, wearing heat-resistant gloves, goggles, and a multi-colored mask. First, she threw flaming cardboard into a marked police sedan, and ran from the car. Then, as flames began to emerge from the car, she returned, pulled a burning piece of wood – that was part of a police barricade – from inside the car, and shoved the wood into a police SUV, which then also caught fire. As the minutes passed, both vehicles were completely engulfed in and destroyed by fire, as the stunning images were broadcast to the city and ultimately to a national audience.

A diligent FBI investigation identified and located Blumenthal in short order. In part, the distinctive blue t-shirt she wore was traced to an online purchase she made. And photographs of the arsonist showed distinctive tattoos on her arm that match those on her person.

A search of her residence on June 15 located the blue t-shirt; the mask and black boots she wore; the goggles; and notably, the same backpack she was seen carrying during the May 30 incident. In that backpack, agents found white/grey gloves, which appear to match those the defendant wore on May 30, 2020. There appeared to be two gloves when the gloves were first discovered. On closer inspection, one of the gloves was "doubled up," such that there were actually a total of three gloves. The gloves were examined by an FBI Special Agent with training in explosives who opined, based on his experience and training, that the gloves contained insulation consistent with heat-resistant

materials, and that they had an elastic sealing around the wrist portion of the gloves. The tags had been removed from the gloves.

Based on these facts, Blumenthal was charged in a complaint with using fire to damage property belonging to an organization receiving federal financial assistance (which the Philadelphia Police Department is), in a manner creating a substantial risk of injury to any person, in violation of 18 U.S.C. § 844(f)(1) and (f)(2).

The unambiguous proof of violent acts demonstrates her danger to the community. The defense attempts to ignore this. Instead, the defense strains to minimize the crimes as only "against property," Mot. 5, and then makes the startling assertion that "[t]he question of whether a person poses a danger to the community is based not on the crime charged, but rather on past conduct," *id*. Needless to say, the defense presents no authority for that baseless assertion.[2]

These were not simply crimes against property, damaging as they were. They were explosive and dangerous acts in the middle of large and fluid protests. And they were targeted directly at the law enforcement institution meant to keep peace, vividly demonstrating the defendant's complete lack of regard for law enforcement. That establishes both her danger to the community *and* her risk of flight, as does additional evidence.

---

[2] Conceivably, this would mean that a first-time offender can shoot someone in broad daylight, but not be detained because only previous conduct may be considered. The notion is frivolous.

## B. The Mandatory Minimum Penalty Creates and the Circumstances of the Arrest Manifest a Risk of Flight.

Section 844(f)(2) presents a mandatory minimum sentence of seven years' imprisonment. The penalties in this case (up to a maximum of 80 years' imprisonment) present a risk of flight, as does Blumenthal's concerning conduct at the time of arrest.

At that time, when law enforcement approached the defendant's home, agents repeatedly knocked and announced that they were FBI agents, with a search warrant, and asked that someone come to the door. An individual was seen looking out from an upstairs window, and agents yelled to the individual to open the door. Agents again knocked and announced at the front door that they were present with a search warrant, and requested that the door be opened. Still, no one appeared, and agents had no choice but to begin a forced entry through the initial front door, which was, in part, made of glass. Visible past the first door was a second glass door, leading from the entryway into the main house. As agents began using a ram to force open the door, the defendant appeared behind the second door, and was visible to agents.

The defendant opened the second door, and began screaming at agents, asking where the warrant was, but refusing to open the front door. Agents ceased attempting to force entry on the front door, and repeatedly asked the defendant to open the door. She refused to do so. As a result, agents forced open the front door, and as agents entered the house, the defendant began running through the house, heading for the stairs, in an attempt to avoid apprehension by the agents entering the house. She was caught by an

agent in the living room, and was told that she was under arrest, and was asked to place her hands behind her back. The defendant refused, continually struggling, and eventually falling to her knees as a result. A second agent had to assist the first agent in order to handcuff the defendant. The defendant continued to scream throughout this encounter. The defendant's obstructive behavior continued through her processing when she was brought to the FBI offices, where she attempted to prevent routine booking procedures such as the photographing of her tattoos by contorting her body.

During the search of the defendant's home, agents also found several cell phones. These phones, along with other seized electronic devices, were sent to the FBI's Regional Computer Forensics Laboratory ("RCFL") for analysis. The RCFL determined that one of the defendant's phones had been forcibly tampered with. The SIM card for the phone was found to have been removed forcibly with a blunt object. The SIM card was not recovered during the search. Additionally, the face of the phone was smashed. During the search, this phone was found lying next to a fork. It appears that during the time between when law enforcement first knocked on the defendant's front door and when she appeared at the door, the defendant tampered with evidence, by using a fork to pry a SIM card from her phone and destroy that card, and smashed the front of the phone.

All of these facts – the significant penalties Blumenthal faces, along with her contemptuous conduct at the time of arrest and effort to destroy evidence – plainly establish a risk of flight in addition to the danger she presents.

### C. The Defendant's Personal Circumstances Do Not Mitigate the Concerns.

The defendant is currently unemployed. She previously worked as a massage therapist. She has a minor criminal record, involving two convictions for retail theft stemming from 2008. For one, she pled guilty and was ordered to pay fines and fees; for the other, she received a sentence of Accelerated Rehabilitative Disposition ("ARD").

She has resided in a home with several roommates in Philadelphia. The defendant also has significant ties to Iceland, a non-extradition country. She reports having a boyfriend in that country since 2017, and that she has traveled to Iceland *six times* in the past year. She now claims that she will reside with her mother in a Philadelphia suburb if released. Her mother, however, was unaware that her daughter lived with roommates, and that her daughter had been dating someone in Iceland since 2017.

The defendant has also submitted letters in support of her release. The government notes that many of these letters are either not dated, or dated June 16, 2020. The nature of the allegations against the defendant were not made public until June 17, 2020. Thus, many of these individuals provided letters with no background on what the defendant had been charged with. Indeed, several letters specifically mention that the author does not know why the defendant has been arrested, but they were asked to provide a letter of support. For example, one letter begins: "I was requested to draft this letter by the sister of Lore Blumenthal via message in the middle of the night. I wasn't aware of the details, even while writing this I am unaware of many key points, regardless here I sit." *See* Def. Exhibit A, page 26.

Moreover, while these individuals write letters in support of their view of the character of the defendant, it is clear that these individuals do not know the full capability of the defendant. This defendant did not merely commit a "property crime," as she alleges, but rather, two arsons in the middle of hundreds of people -- putting all those lives at risk. Regardless of the nature of her character that the defendant has presented to the individuals who wrote these letters, the crime of which the defendant is charged – and for which there is significant evidence, as described above – shows that the defendant is a person capable of putting lives at risk. The defendant, through her actions, has presented a true picture of the individual she is. She did not travel to the protests in Center City intent on peacefully protesting. She, instead, demonstrated her intent to engage in violent criminal activity when she went to peaceful protests armed with heat-resistant gloves and goggles. She used these tools to protect herself, though not others, when she deliberately set two police cars on fire.

The facts present a compelling case for pretrial detention. While the defendant has ties to this community, the legislative history of the Comprehensive Crime Control Act of 1983 indicates that Congress found that community or family ties do not and should not weigh heavily in the risk of flight analysis. *See* Sen. Comm. on Judiciary, *Comprehensive Crime Control Act of 1983*, S. Rep. No. 98-225, 98th Cong., 1st Sess. 24, 25 (1983). No doubt, the dozens of well-meaning friends and family members who support the defendant attest to her admirable qualities. But none of them were apparently present when she torched two police cars in broad daylight in the middle of a mass protest, and

none of them even attempt to reconcile the plainly dangerous nature of this planned and violent conduct with the person they profess to know.

What is relevant is the defendant's brazen criminal conduct, as well as her efforts to thwart law enforcement, and the penalties she faces. The motion to revoke the detention order addresses none of these facts. Rather than address the vivid evidence of the danger presented by the defendant, defense counsel chooses to simply ignore it.

### D. The Defendant's Health Concerns Do Not Warrant Release.

The defendant also asserts that she should not be detained because of her medical condition. She provides a letter from Vicky Borgia, M.D., to document her medical conditions, which include supraventricular tachycardia ("SVT," referring to rapid heartbeat), endometriosis, chronic insomnia, anxiety, and PTSD. Dr. Borgia states in her letter: "[w]ithout frequent surveillance and treatment, these medical conditions can cause severe morbidity and possibly death." However, the doctor does not list what, if any, treatment is required. Indeed, at the time of her arrest, Blumenthal stated that she is currently not taking *any* medication. In any event, the Bureau of Prisons provides complete medical services and there is no reason to believe that it cannot monitor Blumenthal and provide any treatment as needed.

Of course, the danger of COVID-19 must be considered. To be sure, Blumenthal presented exactly the same conditions on May 30, when she elected to go in public in close proximity with hundreds or even thousands of others and engage in criminal acts. Still, it is the government's obligation to keep detainees safe to the extent possible from

the worst effects of this infectious disease, and BOP is presently capable of that. As the Court is aware from its review of other matters, BOP has engaged in strenuous and thus far successful efforts to maintain the health of the 1,000 inmates at the FDC, where Blumenthal is presently held. BOP has limited inmate movement, suspended social and most attorney visits, constantly monitored its staff, and taken many other steps. The result is that, three months into a pandemic that has sickened over 25,000 people in this city, there has not been a single symptomatic case in the general inmate population in the FDC of a disease that has an incubation period of 14 days. That is a remarkable record.

Further, Blumenthal does not appear to be a person at risk of a severe outcome even if she contracted the disease, as she is a young woman in relatively good health. Endometriosis, chronic insomnia, anxiety, and PTSD are not risk factors identified by the CDC for a severe outcome from COVID-19, and to our knowledge are not related to the disease at all. The only question is presented by supraventricular tachycardia ("SVT," referring to rapid heartbeat). Only one reported case has addressed that condition, noting that "[s]upraventricular tachycardia is not contained in the CDC's arguably non-exhaustive list, so it is not clear whether tachycardia increases one's risk of serious illness from COVID-19." *United States v. Spencer*, 2020 WL 3047439, at *4 (N.D. Ohio June 8, 2020). The *Spencer* court denied a request for compassionate release. Indeed, while the CDC lists as risk factors "[s]erious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension," *see* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-

higher-risk.html#serious-heart-conditions (accessed June 22, 2020), there is no published information listing SVT as presenting such a serious condition.

Considering all of these facts, there is no medical basis for release in this case. Most significantly, her medical conditions did not keep her from engaging in the violent, criminal acts she took, and would not impede her ability to engage in additional dangerous conduct or attempt to flee.

### E. Pretrial Detention is Warranted.

In sum, the defendant has shown that she has no respect for either law enforcement or the criminal justice system. Any family ties, previous employment, or other ties to the community were not sufficient to prevent her from setting fire to two police cars – actions which placed in danger members of that community, and that destroyed police cars used to protect her community. The facts establish, by at minimum clear and convincing evidence, that she is a danger to the community, and by a preponderance of the evidence that she is a risk of flight.

The weight of the evidence against the defendant is substantial and presents a strong likelihood of conviction. She intentionally set fire to two police cars on May 30, 2020. Her doing so was not by accident – she traveled to the protests taking place in the city that day outfitted with heat-resistant gloves and protective eye goggles. By setting two vehicles on fire, she placed at risk the lives of numerous individuals who were in the immediate vicinity that day. She also took from the community two taxpayer-funded vehicles that exist to respond to emergencies to keep the community safe.

As a result of these actions, the defendant faces a sentence of up to eighty years in prison, with a mandatory minimum of seven years' incarceration. She has also shown her defiance of the criminal justice system. An examination of all of these factors makes clear that that no condition or combination of conditions will reasonably assure the presence of the defendant as required and/or the safety of the community.

**F.     Conclusion.**

This is a perilous time in our country. Americans are not only suffering through a deadly pandemic, but also presenting and witnessing an explosion of grievance regarding the treatment of minority citizens and the nation's halting and never-ending quest toward racial equality and equal justice. The entire country saw an African-American man die under the knee of a police officer in Minneapolis, leading to criminal charges brought by the state against four police officers, and has been grappling with many other disturbing events. All of this led, and may continue to lead, to an outpouring of mass protest demanding accountability and change.

The right to peaceful protest, a fundamental privilege enshrined in and protected by the First Amendment, must be upheld. And at the same time, dedicated law enforcement officers must do their duty, within the law, to keep protestors safe, protect human lives, and protect public and private property, against those who would act unlawfully.

In this most combustible moment, the actions of the defendant, broadcast on live television, are profoundly dangerous. She took advantage of peaceful protestors, in their

midst, to dramatically set fire to two police vehicles. She acted with evident intent, arriving on the scene wearing heat-resistant gloves. She not only destroyed valuable and essential public property, but risked harm to everyone in the crowded vicinity, citizens and police officers alike, while seeking to add an example of mayhem to the protestors' legitimate political messages. A person who engages in destructive violence in the midst of mass, legitimate protest presents a particular danger to the community at this moment in time, and should be detained to protect the community.

                                                  Respectfully submitted,

                                                  WILLIAM M. McSWAIN
                                                  United States Attorney

                                                /s Amanda R. Reinitz
                                                  Amanda R. Reinitz
                                                  Assistant United States Attorney

Dated: June 23, 2020

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| v. : | **Magistrate No. 20-1002** |
| **LORE-ELISABETH BLUMENTHAL** : | |

## **PRETRIAL DETENTION ORDER**

AND NOW, this _____ day of June, 2020, upon consideration of the Defendant's Motion to Appeal from the Magistrate's Detention Order, and the Government's Response in Opposition Thereto, it is hereby

ORDERED

that the pretrial release order issued by the Honorable Marilyn Heffley, United States Magistrate Judge, is AFFIRMED. It is further ORDERED that the defendant be detained pending trial.

BY THE COURT:

_____
HONORABLE C. DARNELL JONES, II
*Judge, United States District Court*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by electronic mail on the following defense counsel:

Paul Hetznecker, Esquire
phetznecker@aol.com

/s Amanda R. Reinitz_____
AMANDA R. REINITZ
Assistant United States Attorney

Date: June 23, 2020